Gregory J. Bevelock
LAW OFFICE OF GREGORY J. BEVELOCK, LLC
12 Main Street, Suite 2
Madison, NJ 07940
(973) 845-2999
*Attorneys for Plaintiff,*
*DLT International LP*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DLT INTERNATIONAL LP, <br><br> Plaintiff, <br><br> v. <br><br> KENNEDY FUNDING FINANCIAL, LLC, <br><br> Defendants. | CIVIL ACTION NO. <br><br><br> **COMPLAINT** |

Plaintiff, DLT INTERNATIONAL LP (hereinafter, "Plaintiff" or "DLT"), whose principal place of business is located at Secure House Manders Estate, Old Heath Road, WV1 2RP Wolverhampton, England, for its complaint against defendant, KENNEDY FUNDING FINANCIAL, LLC (hereinafter, "Defendant" or "KFF"), whose principal place of business is located at 930 Sylvan Avenue, Englewood Cliffs, New Jersey, hereby alleges as follows:

## NATURE OF THE ACTION

1.      This action arises out of a loan commitment entered into by DLT and KFF, pursuant to which KFF agreed to fund a loan to DLT for the purpose of developing a planned community named Palm Springs that is located in Muriu, Ceara-Mirim, Rio Grande do Norte, Brazil.

2.      KFF accepted $160,000 in commitment fees and other payments from DLT, while never intending to fulfill its obligations under the commitment, all the while acting in bad faith

and breaching the parties' loan commitment by not returning the funds to DLT after KFF refused to fund the Loan.

3.       DTL brings this action in order to recover the monies that it paid to KFF and which KFF wrongly has refused to refund to DLT.

## PARTIES

4.       DLT is a United Kingdom registered limited partnership company with a principal place of business located at Secure House Manders Estate, Old Heath Road, WV1 2RP Wolverhampton, England.

5.       DLT's partners are Luiz Fernandes and Paul Telfer.

6.       Mr. Fernandes is a citizen of Brazil.

7.       Mr. Telfer is a citizen of the United Kingdom.

8.       KFF is a domestic limited liability company formed under the laws of the State of New Jersey with a principal place of business located at 930 Sylvan Avenue, Englewood Cliffs, New Jersey.

9.       No member of KFF is a citizen or subject of Brazil, the United Kingdom, or any foreign state.

10.      Upon information and belief, KFF's members are Keven Wolfer and Gregg Wolfer, both citizens of New Jersey.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(2).

12.      The amount in controversy exceeds $75,000.

13.      Venue in this judicial district is proper pursuant to 28 U.S.C. §1391.

2

## FACTS COMMON TO ALL COUNTS

### The Loan Commitment

14. In 2012, DLT was in the process of developing a planned community named Palm Springs, consisting of 347 lots in the state of Rio Grande do Norte, Brazil.

15. DLT contacted KFF to obtain a loan.

16. The parties ultimately, on March 2, 2012, entered into the Loan Commitment ("LC").

17. Among other things, the LC provided that KFF would loan DLT a maximum of $3,000,000, inclusive of the commitment fee and other fees and costs, subject to various conditions set forth in the LC.

18. The actual loan amount loan would be determined by the "as is market value of the real estate Collateral in its present condition."

19. The "as is market value" was to be determined by KFF through a purportedly independent firm retained by KFF.

20. Upon making a determination of the value, KFF would make a Loan Offer to DLT equal to 50% of the as is market value and not in excess of the maximum $3,000,000 loan.

21. The collateral, on which KFF would place a first lien, would be the property comprising the Palm Springs development being developed by DLT.

22. The collateral was owned by Ritz Property Investimentos Imobilarious LTDA ("Ritz"), a Brazilian registered company affiliated with DLT.

23. The LC provided that it would become effective only upon DLT's delivery to KFF of a signed copy of the LC along with the commitment fee in the amount of $90,000.

24.     Upon acceptance of any Loan Offer made by KFF under the LC, DLT was required to pay another $10,000 to KFF for KFF's "preliminary due diligence including, without limitation, environmental, survey and title review by KFF and third-parties."

25.     The LC also provided that, if KFF was unable to perform its obligations under the terms of this LC "for whatever reason," KFF would be obligated to refund the commitment fee.

26.     The LC also required DLT to pay KFF $10,000 for the preparation of the LC, and the LC acknowledged receipt of those funds from DLT.

27.     The LC stated that closing was to take place "not later than April 11, 2012, time is of the essence."

28.     The LC falsely stated that "[t]he time is of the essence date was included at the insistence of the Borrower who has represented that it will be in a position to meet all requirements contained herein by said date."

29.     DLT did not insist that the closing be made "time is of the essence" and had no understanding of what that phrase might mean under New Jersey law.

30.     KFF inserted that term into the LC as part of its scheme to collect commitment fees from DLT without ever intending to close on the loan.

### KFF's Breaches of the Loan Commitment

31.     Upon execution of the LC by DLT on March 2, 2012, DLT immediately wired the $90,000 commitment fee to KFF.

32.     Notwithstanding that the parties had less than six weeks until the April 11 closing date, KFF took almost three weeks to provide its appraisal of the property to DLT and make the formal Loan Offer.

33.     KFF retained Vernon Martin of American Property Research to perform the appraisal of the collateral for the loan, who opined that the value of the collateral was $4,450,000, which was far lower than the actual value of the collateral.

34.     Based on that appraisal, KFF, by letter dated, March 20, 2012, extended a formal loan offer in the amount of $2,225,000 – 50% of the appraised value – subject to satisfaction of the terms and conditions set forth in the LC.

35.     Although KFF's appraisal vastly undervalued the collateral DLT promptly accepted the Loan Offer.

36.     By letter dated March 27, 2012, KFF confirmed DLT's acceptance and requested that DLT pay the additional $10,000 to KFF required under the LC for KFF's preliminary due diligence.

37.     DLT promptly paid KFF the $10,000.

38.     Notwithstanding that DLT paid the $90,000 commitment fee on March 2, 2012, and notwithstanding that the parties were trying to close on April 11, 2012, KFF waited until March 28, 2012, a mere two weeks before the initial closing date, to send to DLT's Brazilian attorneys KFF's "form" loan closing documents, closing checklist and borrower's opinion so that DLT's attorneys could "get started."

39.     Even at that late date, KFF would not commit to the "form" documents being all the information it would require. KFF stated that "certain items may be added and others deleted" to conform to the transaction.

40.     KFF, through no fault of DLT, was not prepared to close on the April 11, 2012 closing date.

41. The parties, however, continued working on the transaction based on KFF's representations that the closing could take place on May 1, 2012.

42. DLT provided KFF with executed loan closing documents, as well as the opinion counsel and other information requested by KFF.

43. In contrast to DLT's good faith and aggressive efforts to close the loan, KFF continually sat back and refused to take even the most minimal actions to close the loan.

44. Even though DLT's development and the collateral for the loan were located in Brazil, KFF did nothing to obtain Brazilian counsel until April 2012 – after the initial closing date.

45. Moreover, KFF only found counsel because DLT introduced KFF to Brazilian counsel, who KFF retained on April 27, 2012.

46. KFF wanted Brazilian counsel to assist KFF in obtaining for KFF a CNPJ number.

47. CNPJ is short for Cadastro Nacional da Pessoa Jurídica in Portuguese, or National Registry of Legal Entities.

48. A CNPJ number is an identification number issued to Brazilian companies by the Secretariat of the Federal Revenue of Brazil (in Portuguese, Secretaria da Receita Federal).

49. KFF was required to have CNPJ number in order for a mortgage to be placed on the collateral for the loan.

50. The mortgage could not be placed on the collateral and the title policy could not be issued without issuance to KFF of a CNPJ number.

51. Accordingly, the loan could not close without KFF obtaining a CNPJ number.

52. On April 30, 2012 – one day before the anticipated closing date – DLT contacted KFF's in-house attorney asking about the status of KFF's efforts to obtain a CNPJ number and advising that was all that was needed in order to place the lien on the collateral.

53.     KFF's in-house attorney, however, responded by saying that the closing could not take place because there were unspecified "due diligence" items that KFF was working on with its Brazilian attorneys.

54.     KFF's in-house attorney further stated that he would coordinate with KFF's Brazilian attorneys to obtain a full list of purportedly outstanding due diligence items, and also stated that DLT should contact Kevin Wolfer of KFF to discuss "a possible extension" to the LC.

55.     Although the parties were working towards a May 1, 2012 closing date, KFF never intended to close on that date, but rather was purposely delaying the closing in order to extract another commitment fee payment from DLT.

56.     KKF ultimately agreed to extend the closing date to June 25, 2012, but only upon the extraction by KFF of another $30,000 from DLT, which DLT paid on May 29, 2012.

57.     Like the initial closing date, the June 25, 2012 closing date was unreasonably made "time is of the essence."

58.     KFF, however, never intended to close on the loan.

59.     Rather, KFF continued to delay the closing by raising various issues and not engaging in good faith with DLT to resolve them.

60.     This resulted in KFF ultimately extracting another $15,000 from DLT in order to extend the LC to July 19, 2012, which subsequently was extended to August 2, 2012.

61.     These closing dates also were unreasonably made "time is of the essence."

62.     KFF was not prepared to close on either June 25, 2012, July 19, 2012, or August 2, 2012.

63.     Rather, during this time period, KFF continued to raise new issues that were in reality pretexts for KFF not to close the loan, but to extract commitment fees from DLT.

64.    KFF ultimately relied on three issues to delay the closing, none of which were valid reasons for failing to close the loan because all of which were easily resolvable had KFF been acting in good faith rather than just sitting back and letting the clock run out so that it could attempt to extract additional payments from DLT.

65.    The three issues were:  (a) the potential under Brazilian real estate law for there to be unrecorded private sales of some of the lots that were to comprise the collateral for the loan; (2) the payment of local taxes, referred to as the IPTU tax; and (3) an environmental lawsuit against Ritz brought by the Brazilian government environmental agency, IDEMA.

66.    All of these issues were resolved, or could have been resolved, long before the August 2, 2012 closing date had KFF not simply sat back and refused to affirmatively attempt to resolve these issues.

67.    As to the potential for unrecorded private sales, DLT had represented to KFF which lots had been sold privately and were not part of the collateral.

68.    Moreover, as early as mid-July 2012, DLT's Brazilian attorneys advised KFF that, even assuming arguendo that one of the lots included in the collateral was privately sold, that would not prevent KFF from placing a first lien on the lot, which is exactly what the LC required.

69.    At no time did KFF provide any contrary view of Brazilian law based on the opinion of its own Brazilian attorneys.  Rather, KFF simply would not engage in any meaningful way.

70.    The IPTU tax issue also was a complete non-issue.

71.    DLT advised KFF, and once again, KFF never disputed, that at the time of closing there were no taxes due and owing by Ritz, the owner of the property.

72.    That taxes would be due in the future did not prevent KFF from placing a first lien on the property.

73. Moreover, DLT offered to create a reserve fund for the future payment of taxes.

74. The IDEMA matter likewise did not prevent the closing.

75. DLT advised KFF, and KFF again did not dispute, that this matter – which involved the mistaken cutting down of a tree on protected lands – was resolved by Ritz (not the borrower, DLT) agreeing to build IDEMA a small office building.

76. The office could not be constructed yet because the infra-structure on the property was not complete.

77. The estimated cost of the building, however, was only R$21,000 (which at the conversion rates in 2012 was only about $11,000).

78. This is a *de minimis* amount, which was owed by Ritz – not the DLT – and in no way prevented closing.

79. Moreover, DLT offered to establish a reserve for this amount as well.

80. KFF continually delayed in responding to the information provided by DLT and never affirmatively attempted to resolve these issues.

81. Indeed, although KFF knew as early as April 2012 that it needed a CNPJ number in order for a mortgage to be placed on the collateral and the title policy to issue, and although KFF had retained Brazilian attorneys for that purpose, and although DLT had paid KFF $10,000 for KFF to pay its professionals, KFF *never* obtained a CNPJ number, thereby demonstrating that KFF never intended to close.

82. KFF continually made excuses as to why it had not obtained a CNPJ number and continually put the onus on DLT to facilitate the issuance of one, rather than affirmatively attempting to obtain the number itself.

83.     The only reasons the loan did not close on August 2, 2012 – or on one of the prior closing dates – is because KFF was not prepared to close, but rather continually engaged in delay tactics and evasions to avoid resolving any outstanding issues.

84.     KFF never affirmatively attempted to negotiate the purported issues it raised in its due diligence, none of which were valid bases for not closing on the loan.

85.     KFF never obtained a CNPJ number, which was a prerequisite to issuing the title policy, which DLT had paid $5,000 to First American Title for the title work.

86.     After the August 2, 2012, date for the closing passed, DLT explained to KFF that all of these issues were resolved based on information that DLT had provided to KFF in July 2012. DLT further explained that the delay in closing was not due to any action or inaction of DLT, but rather due to KFF and its Brazilian attorneys.

87.     DLT thus requested that the LC be extended so that the parties could close and also requested that KFF confirm that all of these issues had been resolved.

88.     Notwithstanding the DLT had provided sufficient information to KFF to resolve these issues at least as early as July 2012, KFF would not commit to DLT that the issues were resolved and would not reinstate the LC without requiring DLT first to pay an additional $10,000 purportedly for KFF's attorneys (even though KFF was using its in-house attorney, and even though DLT had already provided KFF with $10,000 for this purpose) and an additional $14,865 for a new appraisal.

89.     In other words, even though the delay in closing was caused by KFF and not DLT, KFF refused to extend the LC without DLT making another payment, this one of almost an additional $25,000.

90.     More importantly, KFF would not clearly and unambiguously commit to DLT that the issues that KFF raised – which in reality were pretexts for not closing – had been resolved without DLT first paying KFF even more money.

91.     Indeed, from the time these issues were first raised KFF, KFF took no affirmative steps to resolve them or to negotiate in good faith.  Rather, KFF simply sat back, let the time for closing expire, and then demanded additional payments from DLT before KFF would even advise whether it now deemed these issues resolved.

92.     DLT had further communications with KFF in October/November 2012 and February 2013, in an attempt to close on the loan, but each time KFF refused to advise whether the issues were resolved and demanded more money from DLT.

93.     KFF never made the loan and has refused to refund to DLT the $160,000 it paid in commitment and other fees.

94.     DLT now brings this lawsuit in order to recoup that money from DLT.

**COUNT I**
**(Breach of Contract)**

95.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

96.     DLT and KFF entered into the LC pursuant to which, KFF was obligated to loan certain funds to DLT upon the satisfaction of certain conditions.

97.     DLT satisfied all conditions to the loan that were DLT's obligations and were in DLT's control, or alternatively, was unable to do so only because of the actions or inactions of KFF, including without limitation the payment of $160,000 in commitment and other fees.

98.     The loan did not close due to KFF's inability and/or failure to perform its obligations under the LC.

11

99.     KFF thus breached its contractual duties to DLT and DLT is entitled to return of the $160,000 is paid in commitment and other fees.

100.    As a direct and proximate result of Defendant's breaches of contract, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands entry of judgment against Defendant awarding Plaintiffs

a.      compensatory damages;

b.      reasonable costs and attorney's fees; and

c.      such other and further relief as the Court deems necessary and just under the circumstances.

## <u>COUNT II</u>
### (Breach of Good Faith and Fair Dealing)

101.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

102.    DLT and KFF entered into the LC pursuant to which, KFF was obligated to loan certain funds to DLT upon the satisfaction of certain conditions.

103.    Every contract in New Jersey contains an implied duty of good faith and fair dealing, which calls for the parties to a contract to refrain from doing anything that will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.

104.    Once KFF accepted the commitment fee from DLT, it had an affirmative duty to negotiate a deal in good faith and was required to affirmatively attempt to resolve any collateral issues that arose.

105. KFF breached its duty of good faith and fair dealing because, among other things, it did not affirmatively attempt to resolve the three issues KFF raised and did not obtain a CNPJ number.

106. As a direct and proximate result of Defendant's breaches, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands entry of judgment against Defendant awarding Plaintiffs

a. compensatory damages;

b. reasonable costs and attorney's fees; and

c. such other and further relief as the Court deems necessary and just under the circumstances.

### COUNT III
### (Restitution)

107. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

108. DLT performed under the LC and the amendments thereto by paying the commitment fees and other fees to KFF.

109. DLT thereby conferred a benefit on KFF.

110. KFF, however, breached its obligations under the LC and impeded DLT from performing its obligations under the LC.

111. DLT, therefore, is entitled to restitution of the $160,000 in commitment and other fees paid to KFF.

**WHEREFORE,** Plaintiff demands entry of judgment against Defendant awarding Plaintiffs

a. compensatory damages;

b. reasonable costs and attorney's fees; and

c. such other and further relief as the Court deems necessary and just under the circumstances.

## COUNT IV
### (Unjust Enrichment)

112. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

113. DLT conferred a benefit on KFF by paying KFF the $160,000 in commitment fees and other fees.

114. In exchange for the payment of the commitment fees and other fees to KFF, DLT expected KFF to provide a loan to DLT, which KFF did not provide.

115. In exchange for the payment of the commitment fees and other fees to KFF, DLT expected KFF to act in good faith by affirmatively attempting to close the loan by negotiating all collateral issues that arose, which KFF did not do.

116. KFF would be unjustly enriched were it to retain the $160,000 in commitment fees and other fees paid by DLT.

117. DLT, therefore, is entitled to return of the $160,000 in commitment and other fees paid to KFF.

**WHEREFORE,** Plaintiff demands entry of judgment against Defendant awarding Plaintiffs

a. compensatory damages;

b. reasonable costs and attorney's fees; and

c. such other and further relief as the Court deems necessary and just under the

circumstances.

## <u>COUNT V</u>
### (Common Law Fraud)

118.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

119.   In or about February and March 2012 and running through August 2, 2012, KFF through its it owners, officers, agents, employees and/or representatives, including its president, Kevin Wolfer and in-house attorney, Evan Bell, falsely and with the intent to defraud DLT and induce DLT's reliance, misrepresented that, if DLT paid KFF the commitment fee or any additional fee as set forth above and satisfied all conditions contained in the LC, then KFF would close the loan with DLT.

120.   These misrepresentations were material and false when made because KFF never intended to close the loan with DLT.  KFF engaged in scheme to extract commitment fees from DLT while never intending to make the loan.

121.   KFF made these false statements with the intention that DLT rely on them.

122.   DLT actually and justifiably relied on these statements.

123.   As a direct and proximate result of Defendant's fraud, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands entry of judgment against Defendant awarding Plaintiffs

a.   compensatory damages;

b.   punitive damages;

c.   reasonable costs and attorney's fees; and

d.   such other and further relief as the Court deems necessary and just under the circumstances.

15

## COUNT VI
### (NJ Consumer Fraud Act)

124. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

125. The New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-2, prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate….

126. As set forth above, KFF, through it owners, officers, agents, employees and/or representatives, violated the section of the CFA by engaging in a scheme to extract commitment fees and other fees from DLT while never intending to actually make any loan to DLT.

127. KFF required DLT to pay to KFF commitment fees and other fees purportedly in exchange for KFF's promise to make a loan to DLT once DLT satisfied all conditions of the loan.

128. KFF, however, repeatedly and consistently, delayed and impeded DLT's ability to satisfy those conditions and refused to affirmatively negotiate in good faith with DLT to resolve any issues preventing closing of the loan and any issues that KFF claimed prevented closing of the loan to DLT.

129. In so doing, KFF, through it owners, officers, agents, employees and/or representatives, have engaged in the use of unconscionable commercial practices, false promises, misrepresentations, and the knowing omission of material facts.

130. Each unconscionable commercial practice by KFF constitutes a separate violation of the CFA, N.J.S.A. 56:8-2.

**WHEREFORE,** Plaintiff demands entry of judgment against Defendant awarding Plaintiffs

a.    compensatory damages;

b.    statutory and treble damages under the CFA;

c.    reasonable costs and attorney's fees; and

d.    such other and further relief as the Court deems necessary and just under the circumstances.

Dated:  February 15, 2016

LAW OFFICE OF GREGORY J. BEVELOCK, LLC
*Attorneys for Plaintiff*

*/s Gregory J. Bevelock*
Gregory J. Bevelock

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not related to any other pending matter.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2016
Madison, New Jersey

*/s Gregory J. Bevelock*
Gregory J. Bevelock

## LOCAL CIVIL RULE 201.1 CERTIFICATION

Pursuant to Local Civil Rule 201.1, I hereby certify that the matter in controversy is not subject to compulsory arbitration in that plaintiff seeks, inter alia, compensatory damages in excess of $150,000.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2016
Madison, New Jersey

*/s Gregory J. Bevelock*
Gregory J. Bevelock